Steve **REINHOLT**, Appellant
(Defendant),

v.

The **STATE of Wyoming**, Appellee
(Plaintiff).

No. 5131.

Supreme Court of Wyoming.

Nov. 1, 1979.

Frank R. Chapman, Public Defender, and Richard Honaker, Appellate Counsel, Public Defender Program, State of Wyoming, Cheyenne, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., and Gay V. Bartels, Asst. Atty. Gen. (argued), Cheyenne, for appellee.

Before RAPER, C. J., and McCLIN-TOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

This is an appeal from a judgment entered on a jury verdict which found appellant-defendant guilty of burglary and of auto theft in violation of §§ 6–7–201 and 31–11–102, W.S.1977. Appellant contends: (1) that the evidence was insufficient as a matter of law to sustain the convictions inasmuch as the identification of appellant as the perpetrator of the crimes was defective; and (2) that the trial court erred in admitting testimony from one witness to the effect that appellant was made a suspect in the crimes because he had been involved "in similar situations before" with another person who was arrested for these crimes. Appellee-State contends that the evidence was sufficient to sustain the convictions and that appellant's examination of this one witness "opened the door" for the questioned testimony.

We affirm.

## SUFFICIENCY OF EVIDENCE

The standard under which we review the sufficiency of the evidence on appeal of a criminal matter is that we examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith, and give to the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. *Harvey v. State*, Wyo., 596 P.2d 1386 (1979); *Tucker v. State*, Wyo., 594 P.2d 470 (1979). There was evidence to the following effect: Steve Marosok, the 22-year-old son of the manager of Wy-Mont Beverage Company saw a company van on the streets of Sheridan and followed it until it stopped. He talked with one of the two occupants and then reported the van as stolen to the police. Shortly thereafter the police received a report of a burglary of the Wy-Mont main office. A broken bottle of "Black Velvet" whiskey was found in the offices and some of the vending machines were broken. An unsuccessful effort was made to break into the safe. During the investigation of the burglary, the van returned to the area and was found parked nearby. The police found Arthur Beane in the van, either sleeping or unconscious; and they found some of the material taken in the burglary in the van. About an hour before Marosok first saw the van, Paul Wyatt, an employee of a liquor store sold a bottle of "Black Velvet" whiskey to two men, both of whom he described as intoxicated. A tag found on the broken bottle was from this liquor store. Marosok identified appellant as the van occupant to whom he talked, and Wyatt identified appellant as one of the two customers to whom he sold the "Black Velvet" whiskey.

It was on the basis of these identifications that appellant was found to have been one of the participants in the crime. Appellant contends that the identifications were influenced and controlled by pretrial identifications from suggestive photographs, giving rise to a very substantial likelihood of misidentification.

He contends that the witnesses were shown, separately, a series of five photographs of which "only one was a man with long blonde hair and a beard." (Witness Marosok described the criminal as having long blonde hair and a beard. Witness Wyatt described him as having blondish-brown hair and a beard.) The subjects of three of the five photographs had beards, and the subjects of all five of them had long hair. Of the three with beards, two

were color photographs which portrayed black hair and beards. The other one, which was of appellant, was a black and white photograph which portrayed dark hair and beard. The photograph of appellant was not distinctive in relation to the others and does not appear to have an obvious characteristic of being "suggestive."

But, assuming the identification as having the potential of suggestiveness, we note that we recently addressed the propriety of such pre-court identification in *Campbell v. State*, Wyo., 589 P.2d 358 (1979). We there examined the current status of the law relative thereto and made reference to the pertinent authorities. It would be redundant to again review the matter here except to note the conclusions therein reached relative to the issue. We there concluded that the consideration is whether or not there is a very substantial likelihood of irreparable misidentification upon a *totality of the circumstances*; that the pretrial identification evidence is admissible if it possesses features of reliability despite a suggestive aspect; and that in making the determination of reliability, the following factors should be weighed against the corrupting effect of the suggestive identification itself:

1. Opportunity of the witness to view the criminal at the time of the crime;

2. The witness' degree of attention;

3. The accuracy of his prior description of the criminal;

4. The level of certainty demonstrated at the confrontation; and

5. The time between the crime and the confrontation.

With reference to these factors the record reflects:

### 1. View Opportunity

Witness Marosok opened the door of the van and talked to the driver-appellant for one or two minutes. He said he could see inside the van "fairly good."

Witness Wyatt sold a bottle of whiskey to the appellant and Beane and observed them before the purchase while they were in the store. After they left, he saw one of them sit down behind the building, and he went up to them and asked them to leave. He then closed the store for the night and saw them walking as he went home.

### 2. Witness' Attention

Witness Marosok first followed the van because he thought his sister may have been driving it. When he approached it and talked to the driver, he realized that neither of the occupants were usual employees of Wy-Mont, and he notified the police.

Witness Wyatt watched appellant and Beane "fairly close and tried to keep an eye on" them when they were in the store because they were intoxicated, and he watched them after they left the store for the same reason to be sure they didn't walk on the driveway where "cars come up there pretty fast."

### 3. Accuracy of Prior Description

Witness Marosok described the appellant to officer Nelson as a man with long blonde hair and a beard. Appellant had both.

Witness Wyatt described the appellant to officer Nelson as a man with a beard, blondish-brown hair and rather tall. Appellant had a beard and blondish-brown hair and was 6 feet 4 inches tall.

### 4. Level of Certainty

Both witnesses made a positive identification of appellant in court. Both previously identified appellant's photograph as that of one of the perpetrators of the crime from among five photographs shown to them. Witness Marosok was sure of his identification. Witness Wyatt was "pretty sure" of his. At the trial, both witnesses were shown appellant's exhibits A, B, C, D and E and asked if they were the photographs from which they made their original identifications. Actually and apparently through inadvertence, exhibits A, B, C, D and E were not the photographs from which the original identifications were made. Exhibits F, G, H, I and J were later introduced and were the photographs from which the original identifications were made. Each set of photographs were of the same individuals, but with some differences. Exhibits A and F were of the same individual but

A was taken with the camera closer to the subject. Likewise with Exhibits D and H, with H having been taken with the camera closer to the subject. Exhibits B and I were of the same individual, but in a slightly different pose. Exhibits E and G were of the same individual, but E was a profile photograph and G was full face. Exhibits C and J were of appellant, but he was clean shaven in C and he had a beard and slightly longer hair in J. At the trial, witness Wyatt's certainty was emphasized when he expressed certainty that the photograph from which he previously identified appellant was not among exhibits A through E. Likewise, witness Marosok could not identify exhibit C as the photograph from which he made his prior photographic identification of appellant.

### 5. Time Lapse

The in-court identification of appellant was made six months after the crime and after the time at which both witnesses observed the perpetrator of it. The original photographic identification of appellant was made the day following the crime by Wyatt and six days later by Marosok.

Accordingly, upon the totality of the circumstances in consideration of these five factors, the evidence was such that the jury could find sufficient features of reliability of the identification to overcome any aspect of misidentification through suggestion.

The trial court adequately instructed the jury relative to the care to be taken in assessing the reliability of the identification testimony and that such must be established beyond a reasonable doubt.[1] The instructions noted the necessity to consider each of the five factors except the one having to do with accuracy of prior description, although the court used the words "capacity," "reliable," and "own recollection" in lieu of "degree of attention" and "level of certainty."

There was sufficient evidence upon which the jury could find the identification to be valid and proper.

### OPENING DOOR FOR "SIMILAR SITUATION" TESTIMONY

On redirect examination of officer Tom Nelson, Jr., of the Sheridan Police Department, appellee asked:

"Q. Mr. Nelson, counsel has inquired into why you were—why you had some idea in your own mind that Mr. Reinholt was a suspect. Could you tell us why you had in your mind Mr. Reinholt as a suspect?"

Appellant objected, and out of the presence of the jury, he stated as the ground of the objection an anticipation that the answer would place in evidence a prior conviction of a felony. After argument, the court overruled the objection on the basis that appellant had opened the door for the inquiry during cross-examination of officer Nelson. Whereupon appellee asked the following questions and received the following answers over the objection:

"Q. Mr. Nelson, just before the noon recess, I was attempting to ask you the question, in light of counsel's questions, what led you to suspect Mr. Reinholt, could you tell us?

"A. The fact that him [sic] and Mr. Beane had been old-time acquaintances and they had been involved in similar situations before together, and I had personally seen them a couple weeks before that together, and also, the physical description given by Mr. Marosok at the time when the police dispatcher gave it to us over the radio led me to believe that.

"Q. When you're investigating into this kind of circumstance where you have one unknown party, what's the procedure an officer generally follows?

"A. Take all the evidence possible and try to make an assumption of what is happening, also to find your suspects and figure out who could possibly be involved, take the most common and prevalent suspect that comes to mind or that the situa-

---

1. The trial court's lengthy instruction in this respect was not objected to by appellant and appellant did not offer an alternate instruction.

tion indicates, and follow it through either eliminating the suspect or coming up with the suspect."

Following are the pertinent portions of appellant's cross-examination of officer Nelson from which appellee contends appellant was opening the door for the foregoing questions and answers by suggesting to the jury that officer Nelson "had some vendetta" against appellant and had made him a suspect in these crimes improperly and without reason:

"Q. After you arrested Mr. Beane, you continued your investigation, is that right?

"A. Yes, sir.

"Q. Now, did you talk to Steve Marosok?

"A. Not that evening, I didn't.

"Q. When did you first talk to him?

"A. I never talked to him—

"Q. Did you ever talk to a man named Paul Wyatt?

"A. It was later on in the day, yes. It was the evening of the 28th.

"Q. And you never spoke to Steve?

"A. No, sir.

"Q. How did you find Paul Wyatt, what led you to him?

"A. I started to check all the downtown area bars and liquor establishments in regards to a bottle we had found.

"Q. And while you were doing that, did you have some pictures with you?

"A. Yes, sir.

"Q. Because you had already decided then that you thought it was Mr. Reinholt that was with Mr. Beane, is that correct?

"A. I had an assumption.

"Q. And you hadn't even talked to Steve Marosok yet?

"A. Not Steve, no.

"Q. So, you didn't have a description of anyone else that might have been with Mr. Beane, is that right?

"A. A physical description was given to us by the police dispatcher at the time of the call.

"Q. What was that description?

"A. Blonde hair, rather long, and partial beard.

"Q. Partial beard?

"A. Yes.

"Q. And so you decided from that that you might know who it was and you got some pictures out, is that right?

"A. Yes, sir.

"A. Yes, sir. [sic]

"Q. And you carried them with you when you went to these bars?

"A. Yes, sir.

"Q. Mr. Nelson, when you decided to put some pictures together to take with you to the bars, where did you go to get those pictures?

"A. Through our i.d. system.

"Q. Do you have access to that?

"A. Do I have access to it?

"Q. Yes.

"A. Yes, sir.

"Q. And who made the decision as to what pictures you were going to take along with you?

"A. I did.

"Q. And all you knew at that time was that there was long, blonde hair and a partial beard?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. Do you remember filling out a report in this incident?

"A. Yes, sir.

"Q. Do you remember at that time deciding that you wanted to tie in Steve Reinholt to this thing?

"A. Yes, sir.

"Q. So, you set out to the bars with that in mind, is that correct?

"A. It was my assumption that that was the person involved.

\*    \*    \*    \*    \*    \*

"Q. And after you talked to Paul Wyatt, you filled out what's called a supplementary report?

"A. Yes, sir.

"Q. And do you remember putting in that report, 'If we can get the statement

from Steve Marosok about the driver of the van being long, blonde haired with a blonde beard, and possible a photo i.d., Mr. Reinholt seems to be looking in the same situation as Beane.'

"A. Do I remember writing that?

"Q. Yes.

"A. Yes, sir.

"Q. So, you wanted to get a statement from Steve that would fit your theory of the case, is that right?

"A. I was going to get a statement from Mr. Marosok, or somebody was, to see if it corresponded with what we had found."

■ The appellant acknowledged that the appellee's case rested entirely on identification evidence. The foregoing cross-examination of the police witness was directed to this issue. As set forth, supra, appellant contended that the identification of appellant was influenced by previous identifications from suggestive photographs. The quoted portion of the cross-examination was in effort to buttress this theory by presenting to the jury the story of a police officer who set out at the inception of the investigation to involve appellant for some personal reason. Accordingly, the cross-examination first inquired as to contact by the police witness with the two other witnesses who made the identifications. The police witness was asked if he had "some pictures" with him "because you had already decided that you thought it was Mr. Reinholt [appellant] that was with Mr. Beane [who was already under arrest for the crime], is that correct?" Inquiry was then directed as to the making of a decision by the police witness as to which photographs to display to the identifying witnesses, one of the photographs being that of appellant. The questions then sought to emphasize the *baseless* intention of the police witness to associate appellant with Beane, as follows:

"Do you remember at the time deciding that you wanted to tie in Steve Reinholt to this thing?"

"So you set out to the bars with that in mind, is that correct?"

"And do you remember putting in that report, 'If we can get the statement from Steve Marosok about the driver of the van being long, blonde haired with a blonde beard, and possible a photo i.d., Mr. Reinholt seems to be looking in the same situation as Beane.' "

"So, you wanted to get a statement from Steve [one of the identifying witnesses] that would fit your theory of the case, is that right?"

It was thus proper for the appellee to bring out on redirect examination the police witness' reason for associating appellant with Beane and that such reason was not personal or baseless, but was based on logic and experience.

"It is usually a basic function of redirect examination to allow a witness to explain his testimony elicited on cross-examination. * * *" *Sanville v. State*, Wyo., 593 P.2d 1340, 1344 (1979), citing cases.

The answer to the question asked for this purpose (" * * * What led you to suspect Mr. Reinholt, could you tell us?") is the answer upon which error is alleged. The witness there said that he was led to suspect appellant because of the physical description; because they were old-time acquaintances; because they were seen together a couple of weeks before; and because "they had been involved in similar situations before together." Appellant contends that this last reason implies prior criminal activity by him (and we agree that it does so), and that such implication is reversible error.

■ Ordinarily evidence of prior misconduct of the accused is inadmissible in a criminal proceeding. *Rosencrance v. State*, 33 Wyo. 360, 239 P. 952 (1925); *Newell v. State*, Wyo., 548 P.2d 8 (1976); *State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506 (1957). Rule 404(b), W.R.E. provides:

"(b) * * * Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident."

The exceptions set forth in this rule existed in law prior to adoption of the rule. *State v. Lindsay*, supra; *Valerio v. State*, Wyo., 429 P.2d 317 (1967); *State v. Hambrick*, 65 Wyo. 1, 196 P.2d 661, reh. den. 65 Wyo. 1, 198 P.2d 969 (1948).

Appellee's position is that the questioned answer of the police witness was relevant and admissible under the exceptions in Rule 404(b), W.R.E., concerning identity and opportunity, and that it was admissible in any event under the "opening of the door" rule. The "opening of the door" rule was enunciated in *Sanville v. State*, supra, 593 P.2d at 1344, as follows:

"* * * [A] party who in some way permits the trial judge to let down the gates to a field of inquiry that is not competent but relevant cannot complain if his adversary is also allowed to avail himself of the opening within its scope. [Citations]. * * *"[2]

▮ Regardless of whether one or the other of these two grounds for admission of the answer was sufficient for such purpose, the combination of them was sufficient. As pointed out, the purpose of the cross-examination which triggered the questioned redirect examination was to discount the propriety of the identification of appellant. The cross-examination of the police witness implied a personal antagonism against appellant on the part of the police witness as the reason for a display of appellant's photograph to identifying witnesses. In his answer, the police witness could have omitted the reference to involvement of appellant and Beane in "similar situations before together" from among the several reasons given, but to do so would not have been completely truthful. The cross-examination was directed at the reason the police witness initially identified appellant as Beane's companion in commission of the crime, thus including his photograph among those for display to the identifying witness-

es. The cross-examination inferred the reason to be personal prejudice or antagonism against appellant. The door was therefore opened for the purpose of refuting the inference of personal prejudice or antagonism in the identification. The truthful answer included the fact that appellant was likely to have been Beane's associate in this crime since they were involved in "similar situations before together."

The admission of this testimony was not error. Its purpose was not to prove criminal disposition or propensity of appellant. Its purpose was not to prove appellant's character and that he acted in conformity therewith in this instance. Its purpose was to explain the testimony elicited from the police witness on cross-examination that he had only personal antagonism as a reason for selecting appellant's photograph to include among those to be displayed to identifying witnesses. Its purpose was to support and supplement the identity testimony of the two identifying witnesses. The testimony had direct relationship to the basic defense of appellant, that of identification and the sufficiency of evidence therefor, as discussed in the first section of this opinion.

Affirmed.

ROSE, Justice, concurring.

I concur, but only after engaging in a somewhat different analysis of the "opening of the door" issue.

It is useful to recapitulate the salient facts. An important issue at trial was whether two witnesses correctly identified the appellant. One of the witnesses had been approached by Policeman Nelson who showed him photos of men, including appellant; the witness identified the appellant to Nelson. Appellant, in cross-examining Nelson, established that Nelson, very early in his investigation, jumped to the conclusion that appellant was the guilty suspect. In leading questions directed at Nelson, I think it fair to say that the defense implied that

---

2. Appellee argues that it could have presented testimony as part of its case in chief concerning appellant's association with Beane, including

involvement in "similar situations before" as evidence relative to identification.

Nelson had acted out of a subjective desire to get appellant and that this subjectivity may have adversely influenced the accuracy of the witness' identification of appellant Reinholt. Upon redirect, the State asked Nelson why he had formed the early conviction that Reinholt was guilty. The defense objected, but the trial judge overruled the objection and allowed Nelson to respond as follows:

> "The fact that him [sic] and Mr. Beane [a co-actor] had been old-time acquaintances and they had been involved in similar situations before together, and I had personally seen them a couple of weeks before that together, and also, the physical description given by Mr. Marosok [a complaining witness] at the time when the police dispatcher gave it to us over the radio led me to believe that."

The majority lists a number of persuasive reasons why the answer on redirect, which implies prior bad conduct on the part of the appellant, should be admissible under the "opening of the door" rule. *Sanville v. State*, Wyo., 593 P.2d 1340, 1344 (1979).

However, the "opening of the door" rule is applicable only if the cross-examination of Nelson introduced incompetent evidence. Id. and McCormick's Handbook of the Law of Evidence, § 57 (2nd Ed. 1972). Consequently, the majority's analysis of why the "opening of the door" rule should be applied is persuasive only if it is assumed that the cross-examination of Nelson introduced incompetent evidence. Incompetent evidence means merely inadmissible evidence. McCormick, supra, at § 52.

Ordinarily, it would not be competent for a police officer to testify that he had formed the conviction that the defendant was guilty; it is the province of the jury to determine guilt or innocence. However, evidence may be incompetent for one purpose and competent for another purpose. McCormick, supra, at § 59. If the fact of

Officer Nelson's conviction about appellant's guilt was competent, it was competent because it was relevant to the issue of whether Officer Nelson acted objectively or whether Officer Nelson acted subjectively and procured an inaccurate witness identification.

Assuming, *arguendo*, that the above analysis leads to the conclusion that the cross-examination produced only competent testimony, we must now apply the same analysis to the redirect of Officer Nelson. Accordingly, we must conclude that Officer Nelson's answer elicited on redirect was relevant to the issue of whether Officer Nelson acted objectively in dealing with the eyewitness.

In view of the fact that appellant chose to bring up the subject of Officer Nelson's conclusion about appellant's guilt, I cannot say that the trial judge abused his discretion in determining that the probative value of Nelson's answer to the question was not substantially outweighed by the danger of unfair prejudice. Rule 403, Wyoming Rules of Evidence.

Nor do I see that Rule 404(b), W.R.E., made Nelson's answer on redirect inadmissible. That rule generally prohibits evidence of prior bad acts to prove the character of a person in order to show that he acted in conformity therewith. If the cross-examination of Officer Nelson produced only competent evidence, then Nelson's answer on redirect was offered not to prove that appellant was a bad actor but to prove that Nelson acted objectively in including a photo of appellant among the photos which he showed to the witness.