**Rudolfo AGUILAR, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 87–165.

Supreme Court of Wyoming.

Nov. 21, 1988.

---

Julie D. Naylor, Appellate Counsel, Public Defender Program, for appellant.

Joseph B. Meyer, Atty. Gen., John Renneisen, Deputy Atty. Gen., and Karen A. Byrne, Asst. Atty. Gen. (argued), for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J. Retired.*

CARDINE, Chief Justice.

A jury found appellant guilty of kidnapping, W.S. 6–2–201(a)(ii)(c), and aggravated assault and battery, W.S. 6–2–502(a)(iii), and he was sentenced to two concurrent terms of not less than five years nor more than eight years. On appeal, he contends that the district court erred in refusing to allow his attorney to impeach the victim at trial.

We affirm.

This case arises from an internal dispute among members of an international motorcycle club known as the Vagos. The victim, Daniel Antonio Oroscoe, is fondly referred to as "Fat Tony." Fat Tony became associated with the Vagos in California in 1984 and, in 1985, helped form and was vice-president of the Red Hills Chapter of the club.

While in California, Fat Tony opened a motorcycle shop called Racers 2, where he employed David "Little David" Batchelder as general manager and mechanic. After experiencing marital difficulties, Fat Tony decided to move to Casper, Wyoming, go back to school, and "put his life back together." He wanted to quit the Vagos, but the international president, identified in the record only as "Leonard," told him he could not be released unless he helped with some problems in the Casper chapter. He sold his motorcycle shop to Paul "Citizen Paul" Gibson, president of the Vagos' Red Hills Chapter, for $30,000, part of which would be paid to Fat Tony's ex-wife in $500 monthly installments. Fat Tony left California for Casper on January 15, 1986, and, upon arriving in Casper, he registered for classes at Casper College.

Because of Casper's "quiet" atmosphere, Los Angeles Vagos members who got into trouble would sometimes be sent to Casper to "hide out." Members of the Casper Vagos chapter were less than enamored with their associates from the Los Angeles area. They found Fat Tony particularly irritating, as "[h]e thought he was Mr. Biker, thought he knew how to do it all and people up here in Wyoming didn't know how to do anything as far as being a biker."

While in Casper, Fat Tony performed some of the tasks assigned to him by Leonard. Trouble soon arose, however, in California. Apparently Fat Tony had retained some records when he sold his motorcycle shop, and Citizen Paul wanted them. In addition, Little David was upset over a deal he had made with Tony involving a Jeep. When Leonard heard of these problems, he decided to send several members to Casper to find Tony and "pull his shit." One member of the group was Little David, who traveled to Casper by airplane. The other two were William "Animal" Haupu and Rudy ("Appellant") Aguilar, who drove to Casper and met with Little David.

On the morning of April 10, 1986, Fat Tony rode his large black Harley–Davidson

* Retired June 30, 1988.

motorcycle to anthropology class. After class, he rode to the house of Greg "Highway" Cummings, the president of the Casper chapter, for a visit. Tony parked his motorcycle on the sidewalk in front of Highway's house. He left his books on his sissy bar, but brought along a loaded .25 caliber handgun, concealed in the vest pocket of his leather jacket.

When Fat Tony entered Highway's house, he saw Appellant carrying a handgun and looking "extremely angry." Then he turned to see Animal holding a rifle to his neck and wearing an "evil grin," and Little David walked into the room carrying a handgun. The three men searched Fat Tony and took his gun. One of them said they were there on orders of the Vagos International Chapter and that they had come to retrieve some records for Citizen Paul. They asked Tony to go outside with them and told him they would shoot him if he tried anything funny. Tony knew he was to get into the car parked at the curb. Instead, he tried to escape, and a fight broke out in the street as the three men attempted to restrain him. He momentarily broke free, ran alongside a pickup truck traveling down the street and asked the driver to "please get me out of here, they are trying to kill me." The driver said he would call the police and drove off. The fighting resumed. Tony was kicked and shot with a stun gun. Eventually he stopped resisting and entered the car.

The group headed east on Interstate 25 with Little David behind the wheel. Little David told Fat Tony that his instructions included burying him on the side of a hill. Fat Tony was also told that he "shouldn't have made that fuss out there"; that he had just "sealed [his] fate." Little David pulled off the interstate at the Natrona–Converse county line. Appellant and Little David got out of the car, with Animal remaining in the back seat with Tony. Animal proudly told Tony that he was now the International Sergeant at Arms and said, "I came up here to f— you up." After Appellant and Little David got back into the car, Appellant said something to the effect that "they were going to have to find a road to take [him] off and kill [him]."

The group continued east on the interstate and then exited onto another road, heading toward the river.

The car stopped again, and after a heated argument between Appellant and Little David, Appellant told Fat Tony that they would not have to kill him if he cooperated. The group traveled back to the interstate and on to Douglas, where they bought some hamburgers, chicken nuggets, and beer. Little David then drove to Tony's house where he and Appellant went through toolboxes and file cabinets, finding records and weapons. These items were loaded into the car, and Fat Tony was taken to Sonny McCann's house in Casper. After Little David, Animal and Appellant left the house, McCann allowed Fat Tony to leave. That night, Tony reported the incident to the Casper police.

Appellant was arrested and charged with two counts of kidnapping, one count of attempted first-degree murder, one count of conspiracy to commit first-degree murder and one count of aggravated assault. Before trial, one of the kidnapping counts and the attempted first-degree murder count were dismissed. A jury ultimately found Appellant guilty of kidnapping and aggravated assault, but not guilty of conspiracy to commit first-degree murder. Appellant was sentenced to two concurrent terms of five to eight years.

Appellant now appeals his conviction, contending that he was improperly prevented from impeaching Fat Tony at trial. Specifically, he argues that the trial court erroneously denied the admission of two transcripts into evidence. One of the transcripts was prepared from a telephone conversation between Tony and Terry "Tramp" Orendorf. The other was prepared from a recorded conversation between Fat Tony, Tramp and Citizen Paul at a California restaurant. Both transcripts were offered during cross-examination of Fat Tony in an attempt to show that, in his conversations with Tramp and Citizen Paul, he never mentioned that the three men from California beat him up, kidnapped him or threatened to kill him. The questioning went as follows:

"A. There were conversations between myself and Tramp in Casper, Wyoming, on the telephone, and there were also conversations between myself and Tramp in Los Angeles.

"Q. Okay. I am going to hand you one, one that was between you and Tramp on May 30, 1986, isn't it true that Tramp is quite upset with you, about your conduct in Wyoming, and your conduct as a Vagos?

"A. Would you repeat that?

"Q. Isn't it true that Tramp is upset with you about your conduct here with the Vagos?

"A. At what time?

"Q. Well, this is while you were a member up here apparently.

"A. I never talked to Tramp while I was up here.

"Q. Well, it is on the second page, Tramp stated how about all this bullshit that you went down there to show them how to be Vagos, and goes on and says, what all this shit that you went down there to supposedly show them to be Vagos?

"A. Excuse me, where are you?

"Q. Right in the middle of the page, you claim Leonard talked to you about that and he says he never sent you there to do anything of the sort—

"A. Beg pardon?

"Q. Tramp's statement. I talked to Leonard about it and he said he never sent you down there to do anything of the sort, and go ahead, Hey, Leonard told me to educate them while I was up there, and discussion, Bullshit, you haven't been a Vagos as long as I've been, you haven't got the right to do that.

"A. I'm sorry, where are you now?

"Q. Just down two more lines.

"A. Would you repeat what you just read there?

"Q. Because bullship [sic], you haven't even been a Vagos as long as I've been, so you haven't got the right to do that.

"A. Did you ask me a question?

"Q. Is this a true conversation?

"A. Yes.

"Q. Just one moment—let's go down to the very bottom of page 4, Tony, talking about Leonard—

"A. I beg your pardon?

"Q. Or top of page 5, and you were talking about what happened up in Casper, you stated, when this shit came down up here, they said, I talked to Leonard, Leonard said it was your baby, that you had approved it, and you stated, C.P. was sending Rudy, Animal and Little Dave up here, and Tramp said I approved it? And you said, I swear to God that's what they told, well they told me you approved it and Leonard. Tramp: I told them to go and pick up your patch. There is nothing in there about killing you, is there?

"A. You would have to refer to this conversation that you are quoting is fine, but also goes along with all those subsequent conversations that occurred that were also on record.

"Q. I have got them.

"A. Because at this time—

"Q. Just answer the question, Tony.

"A. Was this a question?

"MR. CHRISTENSEN: No, there is no question, you have no question, Tony.

"Q. You have no question, I haven't asked you the question yet.

"A. Then please ask me the question.

"Q. Tramp after that said I didn't authorize them to take nothing, I said either—"

At this point, the prosecution objected to the use of one of the transcripts, contending that its contents were irrelevant. Appellant's counsel explained her position to the trial judge as follows:

"Your Honor, the defendant is charged with conspiracy to commit murder. Tony claims this started in California from the International president on down. We are now on a conversation where talking with the International vice-president, he never states, one, getting to another point here that anybody was sent to kill him, he realizes in there sent simply to pull his patch and motorcycle and other property of C.P.'s, never once does he ask for any return of other items he

claims were taken. We have further conversations where he talks with Leonard, between Tramp and C.P. where there is never once any mention."

Although the transcripts were not offered into evidence at this point, the trial court expressly reserved ruling on their admissibility. The questioning resumed:

"Q. In your conversation with Tramp either that or the next day, you at no time mentioned the guns supposedly taken out of your trailer.

"A. I don't know, I haven't looked at that transcript.

"Q. And at no time mentioned anyone supposedly wanting to kill you.

"A. I beg pardon?

"Q. And you at no time said anybody was trying to kill you.

"A. I don't remember."

At the close of her cross-examination, Appellant's attorney moved for the admission of the transcripts. The court again reserved ruling. After the State's redirect, the court ruled that the transcripts were not admissible.

The rationale underlying the court's ruling is not clearly discernible from the record. The court might have concluded, and the State argues on appeal, that Fat Tony's silence concerning the incident was not relevant. We disagree with this view. Relevant evidence is defined as

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, W.R.E.

Silence, as well as words, may constitute relevant evidence. This evidentiary principle was recognized in *Ward v. Yoder*, Wyo., 355 P.2d 371, 375 (1960), where we said:

" 'A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. * * *

" ' * * * Omissions to assert anything, or to speak with such detail or positiveness, *when formerly narrating*, on the stand or elsewhere, the matter now dealt with

[is an example of such failure].' 3 Wigmore, Evidence, 3d ed., § 1042." (Emphasis and brackets in original.)

Even though the evidence of silence was relevant, the trial court might have concluded that the transcripts were excludable under Rule 403, W.R.E., which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The probative value of the transcripts was almost nonexistent. The trial court could have reasonably decided against admitting the twenty-six pages of transcript (to show what they *did not* contain) on the grounds of confusion of the issues, misleading the jury, undue delay or waste of time.

Finally, even if the trial court did not apply the Rule 403 balancing test, the exclusion of the transcripts was harmless. Their contents were largely unintelligible and irrelevant, and their exclusion did not prevent Appellant's attorney from impeaching the witness. Counsel could have simply handed the transcript to the witness for his examination and then, in a leading question, asked:

Q. In that transcript of your conversation, there is not a mention of a death threat—or kidnapping—or an assault, isn't that true?

This line of examination at least would be clearly relevant, to the point, and avoid confusion. It would have been preferable to admitting the transcripts and sending them to the jury room.

Rule 103(a), W.R.E., provides:

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *."

Rule 49(a), W.R.Cr.P., states:

"Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

What occurred with respect to the transcript did not have a substantial impact on

the trial or affect a substantial right of Appellant. Appellant's attorney was not prevented from impeaching the witness. Accordingly, we affirm the judgment and sentence.