Danny BENNETT, Appellant (Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 88–236.

Supreme Court of Wyoming.

July 6, 1990.

Public Defender Program: Mike Cornia, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., David K. Gruver, Asst. Atty. Gen., Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Danny Bennett was convicted after a jury trial of two counts of delivering cocaine in violation of W.S. 35–7–1031(a)(ii) and W.S. 35–7–1016(b)(iv) (Cum.Supp.1987), and one count of conspiring to deliver cocaine in violation of W.S. 35–7–1042 (1977). He was sentenced to concurrent terms of four to seven years on each of the delivery counts, and of two to four years on the conspiracy count. Bennett presents seven issues in his appeal:

I. Whether it was plain error to allow the introduction of evidence that two of the state's witnesses had plead guilty to offenses growing out of the same circumstances as the crimes with which Appellant was charged.

II. Whether the admission of testimony stating that the Appellant was guilty of the crimes charged was error per se and plain error and denied Appellant of his right to a trial by jury.

III. Whether the search of the overnight bag found in the trunk of the Mercedes was violative of the Appellant's rights under the Fourth Amendment of the United States Constitution and Article 1 § 4 of the Wyoming Constitution and therefore the admission of evidence seized was error.

IV. Whether the trial court erred in denying Appellant the opportunity to cross-examine a witness concerning possible bias.

V. Whether the introduction of the post arrest statement of co-defendant Jenkins denied the Appellant of his right to confrontation.

VI. Whether it was error to try the Appellant jointly with Defendant Jenkins.

VII. Whether the appellant was denied his right to due process by the introduction of irrelevant, inflamatory [sic] evidence and presentation of arguments which appealed to the fears and prejudices of the jurors.

As we reverse on Bennett's second issue, the use of opinion testimony as to his guilt, we do not address the remaining issues.

Bennett was arrested and charged on February 15, 1988, following a lengthy police investigation of Bennett and several associates, three of whom were arrested with him. The state's case was based principally on three controlled buys made by an informant named Randy Hill at the direction of investigating officer Tony Hinton of the Wyoming Division of Criminal Investigation. These buys. were made on August 13 and 14, 1987, December 5, 1987, and January 1, 1988.

Bennett had been under police surveillance since the summer of 1986 because of activity which was regarded as suspicious, including the use of several vehicles to make recurring brief stops at a number of

regular locations in Cheyenne. The investigators targeted Bennett as a drug dealer, but believed that since Bennett and his associates were black it was necessary to find a black informant to deal with them. Hill, who is black, was arrested and charged with two counts of delivery of cocaine in late July or early August, 1987, and identified Bennett as his supplier. In a plea bargain with prosecutors, Hill agreed to make controlled buys from Bennett in exchange for a reduction in the charges he faced. His testimony about those buys was central to the state's case.

The controlled buys were all conducted in a similar fashion. Hill and his vehicle were searched, and he was supplied with cash and a tape recorder or a listening device and sent to make the prearranged buy. Hinton and Cheyenne police officers followed Hill and observed from a distance. After the buys Hill would meet the officers, turn over the cocaine and the recording or listening device, and describe what had transpired. The investigators searched Hill and his vehicle again after the buys. The first controlled buy on August 13–14, 1987, spanned two days because the money was exchanged on the first day, and the cocaine delivered to Hill on the second. The deliveries involved Bennett, his co-defendant Jenkins, Michael Merritt and Curtis Wilkinson, both of whom pleaded guilty before the trial to charges arising from the buys, and others.

Hill's testimony implicated Bennett in the cocaine deals, although it contradicted his statements to Hinton after the buys in several respects. Hill testified that on August 14, 1987, Bennett called him with instructions for picking up the cocaine; that Hill then met Bennett near Johnson Junior High, and that Bennett told him that Merritt had a package for him; that Bennett arranged with him for the December 5, 1987 transaction over the telephone, and delivered the cocaine to Hill in Bennett's car as it was parked in front of the Carter Brown American Legion Hall; and that Bennett arranged the January 1, 1988 deal, which took place at Wilkinson's residence, and took the buy money from Hill while Merritt handed him the cocaine.

In addition to Hill, Hinton and other investigating officers testified as to their coordination of the buys and observations of the transactions. As part of their plea bargains with the prosecutor, both Merritt and Wilkinson testified against Bennett, though both did so grudgingly and were regarded as reluctant or hostile witnessess. The jury found Bennett guilty of conspiring to deliver and delivery for the August transaction, not guilty of the December transaction, and guilty of delivery in the January transaction. It acquitted Bennett's co-defendant Jenkins of conspiracy regarding, and aiding and abetting of, the January transaction.

## Witness's Opinion as to Guilt of Defendant

Bennett asserts that it was error per se to permit Hinton to state his opinion as to Bennett's guilt, relying on our holding in *Stephens v. State*, 774 P.2d 60 (Wyo.1989). In *Stephens* this court held that testimony elicited by a prosecutor which offers an opinion as to the defendant's guilt should be treated as error per se rather than as a question of plain error because it is impossible to determine whether the jury may have relied on the expressed opinion in reaching its verdict. *Id.* at 68. To permit jurors to rely on a witness's opinion of the defendant's guilt "would be the ultimate abdication of the function of the jury." *Id.* at 64. Unfortunately, because Hinton responded to the prosecutor's request for his opinion and its factual foundation, what occurred here must be treated as error per se.

Our *Stephens* holding was based on our conclusion that testimony offering an opinion as to the accused's guilt is not admissible under W.R.E. 702 and 704. While we agreed that Rule 704 permits evidence upon ultimate issues, we held that "[t]he particular inquiry must focus on whether the * * * testimony serves to assist the jury in resolving the factual issues before it." Opinion testimony about guilt does not address areas that assist the jury in resolving factual issues. *Id.* at 67.

While the opinion testimony in this case may appear to have different significance from that offered in *Stephens*, it was presented in functionally the same way, and the concerns about its effect are the same, namely, that "the testimony could have decided the case for the jury." *Id.* In *Stephens* three expert witnesses were asked, based on their training and experience, their opinion whether or not a child had been sexually molested, and if so, by whom. All answered the first question affirmatively, and all three identified the defendant as the molester. These witnesses were then asked what their opinions were based on. This court found that the direct responses of opinion by the witnesses, as well as what we termed substantive statements of opinion in the form of testimony as to bases for the direct opinions, were impermissible.

In this case, Hinton testified as the investigating officer rather than as an expert. This does not affect our result because we recognized in *Stephens* that opinion testimony as to a defendant's guilt is impermissible whether from a lay or expert witness. *Id.* On redirect examination Hinton was asked,

> Q. Mr. Frentheway [Bennett's attorney] asked you if, in your opinion, Mr. Bennett was a drug dealer and you said yes.
>
> A. Yes.
>
> Q. I'll ask you the next question. Why?

This was followed by an objection and a discussion between the court and the attorneys, resulting in an instruction to Hinton by the court that he limit his answer to the facts introduced to that point in the trial. Hinton acknowledged this limitation, but then, as his factual basis for the opinion just expressed, testified that the investigating officers bought cocaine from Bennett through informant Hill on the three occasions charged:

> A. August 13th and 14th, I was involved in one-eighth ounce cocaine buy between Randy Hill and Danny Bennett where we received one-eighth ounce of cocaine from Danny Bennett. December

4th and 5th, 1987, I was involved in another cocaine buy where we bought one-quarter ounce of cocaine from Danny Bennett through Randy Hill. We've also done surveillance, we've also talked to other informants and we have also talked to other witnesses in these proceedings.

The result is essentially both a direct statement of Hinton's opinion that Bennett is guilty, since Hinton testified that Bennett was, in his opinion, a drug dealer based on the evidence before the jury, and a substantive statement in the unequivocal recitation that Bennett was the source of the cocaine on the charged dates. This went well beyond simply summarizing the facts of his investigation by drawing the ultimate conclusion that Bennett was guilty. It was the jury's role, not the witness's, to make this determination.

*Stephens* also involved little physical evidence, so that the opinion testimony as to guilt and credibility assumed paramount significance, whereas this case does involve more physical evidence and witness testimony. Regardless of this distinction, the concern of improper invasion of the jury's function remains critical and any invasion of the jury's role must be treated as error per se. We are unable to determine the prejudicial effect of Hinton's statement. His opinion, elicited by the prosecutor, taints the trial because of "the impossibility of assessing whether the jury relied upon it in reaching its verdict." *Id.* at 68. In *Stephens* the use of witness testimony as to the defendant's guilt was analogized as "frosting on the cake." As it was aptly put, "if the frosting is bad, the morsel may not stay down even though the cake was sufficient to the need." *Id.* at 64. Here again, the frosting in the form of witness opinion is bad, and the substance of the cake in the form of other evidence must be disregarded.

Finally, the interrelationship of Hinton's statements that it was his opinion that Bennett was a drug dealer and that this was because Bennett was the source of cocaine purchased during the controlled buys, is telling. In response to the prosecutor's questioning Hinton told the jury that in his

opinion Bennett was a drug dealer because Bennett committed the three charged drug transactions. It is difficult to see how jurors could have believed this was anything but an opinion concerning the defendant's guilt. The danger of this testimony compromising the jury function is simply too great to ignore.

■ Although the prosecutor suggested in his question that Bennett's attorney had already asked Hinton his opinion on this issue, we do not find that to be the case. The question asked by Bennett's attorney, in the context of whether or not the special agent's biases affected his interpretation of Bennett's activities, was whether he suspected Bennett of being a drug dealer when he began surveillance. The object and result of this question were distinctly different from those of the prosecutor's questioning, which solicited Hinton's opinion as to whether Bennett was a drug dealer and the facts from his investigation that were the basis for his opinion. Consequently, in light of the concerns which are well presented in *Stephens*, we are compelled to reverse as to this issue.

■ Because we decide this appeal by reversing on Bennett's claim of improper opinion testimony, we need not, and do not, address the remaining claims of error. We do note that the trial court was mistaken when it gave the power to waive attorney-client privilege to prosecution witness Sam Brown's attorney rather than Brown himself. While we do not necessarily suggest that the resulting limit on Brown's testimony was a denial of the sixth amendment right of confrontation, we agree that cross-examination into motives or incentives a witness may have for giving false testimony should be given the broadest possible scope. *United States v. Hall*, 653 F.2d 1002, 1008 (5th Cir.1981). In this light we emphasize that the decision whether to waive attorney-client privilege belongs solely to the client.

As was the case in *Stephens*, the record discloses a strong case against the accused, and it is not without regret that we over-

turn his conviction. However, the Wyoming Rules of Evidence have been misapplied in a way that constitutes error per se and, as we noted in *Stephens*, this sort of opinion testimony is potentially an invasion of an accused's constitutional right to a jury trial. *Id.* at 67, n. 3. This we cannot permit.

Reversed and remanded for new trial.

MACY, J., filed a concurring opinion.

THOMAS, J., filed a dissenting opinion in which CARDINE, C.J., joins.

MACY, Justice, concurring.

I concur. This is not a case where the majority has chosen to coddle drug traffickers but a case where we have uniformly applied case precedent and the constitutions of this state and the United States. To advocate a different standard is ludicrous.

THOMAS, Justice, dissenting, with whom CARDINE, Chief Justice,* joins.

I would affirm Bennett's conviction in this case. I read the record somewhat differently from the summarization in the majority opinion. On my reading of the record, the holding of *Stephens v. State*, 774 P.2d 60 (Wyo.1989), is not implicated in this instance any more than it would be in any other case in which a fact witness testified as to his observations. Surely, the law permits the victim of an armed robbery to testify that the defendant pointed a revolver at him; demanded his wrist watch; and took it. It is certain that testimony such as that by an eye witness does not constitute an invasion of any prerogatives of the jury. In my judgment, the situation in this case is not materially different from the foregoing example.

The propriety of a solution to a problem usually depends to an extent on the perspective from which the problem is examined. There often is a marked difference between the academic solution and a pragmatic solution. The perspective frequently even affects the definition of the problem.

* Chief Justice at time of oral argument.

A popular trial argument in this time is what I call the telegram argument. Counsel urges the judge or jury to send someone a message. I am firmly convinced that this court needs to consider the nature of the message it is sending to drug traffickers. Are we going to tell them that we will endeavor to extend case precedents to the limits so that they may avoid the consequences of their antisocial behavior? Or shall we tell them instead that we choose not to coddle criminals, and we will limit the application of case precedent so far as the constitution allows to make them answer for their crimes? I prefer the more strict attitude to the permissive approach.

The problem confronting the court in this case is the impact of trafficking in controlled substances upon society. Some tend to describe this as a victimless crime. Nothing could be further from the truth. I recently viewed a portion of a television program that addressed the social nightmare of "crack cocaine" babies born in the city of New York. Realism demands recognition that, because of the social costs generated by the drug culture and those who supply the demand, all of us are economic victims of this style of antisocial behavior, and many of us will be victims of criminal acts as well.

I must first of all point out that Bennett's attorney indeed was engaged in an intense effort to suggest that Agent Hinton's investigation and testimony were the product of bias. As I read the record, Bennett's attorney clearly introduced the matter of opinion, and that justified the inquiry by the prosecutor, which was directed at explaining the basis for the answer given on cross-examination. The function of the prosecution's inquiry, as the district judge clearly discerned, was to diminish, insofar as possible, any impression that Hinton was biased.

The questions by Bennett's attorney in the course of interrogating Hinton about whether he actually observed certain individuals, including Bennett, dealing drugs resulted in Hinton's testimony that he never saw anything come out of the hands of these individuals directly. The exchange between defense counsel and Hinton reads in the record:

"Q Now, from what you observed on the weekends and at night, you found Michael Merritt and Curtis Wilkinson and Danny Bennett to be associated with each other at different times and different places during the period of time that you surveilled them; isn't that correct?
"A Yes.
"Q How many times did you actually observe Michael Merritt dealing drugs?
"A My opinion?
"Q No, I want to know what you actually observed—Michael Merritt dealing drugs, handing drugs to somebody or receiving cash?
"A I never saw him—anything coming out of his hands directly.
"Q How about Curtis Wilkinson, did you ever see anything directly come out of his hands or receive anything directly?
"A No.
"Q How about Danny Bennett?
"A No.
"Q But now you began to qualify your questions in your opinion?
"A Yes.
"Q You have opinions about times that you thought that they were doing that; isn't that correct?
"A Yes."

On redirect examination, the prosecutor then interjected this question:

"Q Mr. Frentheway asked you if, in your opinion, Mr. Bennett was a drug dealer and you said yes.
"A Yes.
"Q I'll ask the next question. Why?"

What follows in the record demonstrates that, in the foregoing exchange, Hinton did nothing more than reaffirm that he had answered "yes" to defense counsel's question about his opinion as to whether Mr. Bennett was a drug dealer. After that, Hinton's testimony, including the answer quoted at page three of the majority opinion, was simply nothing more than his explanation of why he held the opinion that had been elicited by defense counsel. It is also important to note that other witnesses

had testified to practically all of the information that Hinton reported as supporting his opinion.

This court, in other contexts, has articulated the proposition that it is fair for the prosecution to develop a matter further when a defendant opens the door to a subject that otherwise might be foreclosed. *Makinen v. State,* 737 P.2d 345 (Wyo.1987); *Reinholt v. State,* 601 P.2d 1311 (Wyo. 1979); *Sanville v. State,* 593 P.2d 1340 (Wyo.1979). That is exactly what happened in this instance when the defendant, in a designed effort to create an impression of bias on the part of Agent Hinton, asked Hinton about his opinion. In this regard, the case is much like *Reinholt.*

It is this opening of the door by Bennett to what would otherwise be clearly inadmissible testimony that serves to distinguish this case from *Stephens.* Counsel for Bennett was engaged in an effort to discredit Hinton because of his bias. Counsel apparently wanted to establish that bias by asking about an opinion held by Hinton, which also addressed culpability for the crime. Such a circumstance might not occur often, but the court should be wary of adopting a rule that would foreclose a technique of advocacy that counsel for a defendant in a criminal case might want to invoke. The disposition by the majority requires the state to object or the trial judge to cut off this effort by the defendant to establish bias. In my judgment, it is better to permit counsel to try the case rather than to foreclose techniques of advocacy simply because, in hindsight, the effort was unsuccessful.

Because I am of the opinion that Bennett's conviction should be affirmed, it is appropriate to discuss briefly the other assertions of error outlined in the majority opinion. As to the contention that plain error occurred when the state was allowed to introduce evidence that two of its witnesses had entered pleas of guilty to offenses arising out of the same circumstances as the crime charged to the appellant, I agree with the state that the prosecution was entitled to use that evidence, both for impeachment and to clarify questions and statements elicited by counsel for the defendant. It is not demonstrable that a clear and unequivocal rule of law was violated. *Scheikofsky v. State,* 636 P.2d 1107 (Wyo.1981). This is not a situation in which error *per se* is assigned. *Munson v. State,* 770 P.2d 1093 (Wyo.1989). *See Stephens; Brewster v. State,* 712 P.2d 338 (Wyo.1985); *Richter v. State,* 642 P.2d 1269 (Wyo.1982); *Clenin v. State,* 573 P.2d 844 (Wyo.1978) (all cases involving allegations of prejudicial error per se).

With respect to the claim of error involving the search of the overnight bag found in the Mercedes, it is a recognized legal doctrine that an automobile may be seized upon probable cause, and that is an accepted exception to the requirement for a search warrant. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790 (1925); *Ortega v. State,* 669 P.2d 935 (Wyo.1983). It is permissible then to inventory the contents of the vehicle that has been impounded lawfully if that inventory is made pursuant to standard police procedure. *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Agent Hinton testified that the inventory of the Mercedes was conducted pursuant to a procedure of his office. The inventory of the vehicle seized upon probable cause, even though conducted without a warrant, was justified. See *Roose v. State,* 759 P.2d 478 (Wyo.1988); *Williams v. State,* 557 P.2d 135 (Wyo.1976).

Insofar as Bennett claims error arising out of a denial of his opportunity to cross-examine another witness concerning possible bias, the record establishes that Bennett was not prevented from asking questions with respect to the witness' motivation for testifying as well as any potential incentives for falsification. He also had the opportunity to ask other questions in an attempt to impeach the witness if he desired. *See Aguilar v. State,* 764 P.2d 684 (Wyo.1988). Furthermore, no offer of proof was made that would serve to preserve this claim of error. *Story v. State,* 721 P.2d 1020, 65 A.L.R.4th 1011 (Wyo. 1986), *cert. denied* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986); *Krucheck v. State,* 702 P.2d 1267 (Wyo.1985). I note that, had counsel been foreclosed from his

effort to demonstrate Hinton's bias, the ruling would be challenged by Bennett under this claim of error.

With respect to the post-arrest statement of the co-defendant, Jenkins, that statement did not involve a confession or an admission of guilt. It also did not constitute an inculpatory statement so far as Bennett was concerned. The only statement introduced was that he did not wish to discuss the defendant's situation, and that statement has no potential for prejudice in the context of this alleged error.

Bennett also contends that he should not have been tried jointly with Jenkins. Joint trials of defendants charged with committing the same offense are the rule rather than the exception. *Jasch v. State*, 563 P.2d 1327 (Wyo.1977). Severance is a matter of discretion and is not subject to reversal absent clear abuse. *Jasch*. Ordinarily, there must be compelling reasons for separate trials. *Linn v. State*, 505 P.2d 1270 (Wyo.1973), *cert. denied sub nom Lucas v. Wyoming*, 411 U.S. 983, 93 S.Ct. 2277, 36 L.Ed.2d 959, *reh. denied* 412 U.S. 944, 93 S.Ct. 2780, 37 L.Ed.2d 405 (1973). Bennett asserts that there were antagonistic defenses, but such a situation is not ordinarily sufficient to constitute the prejudice that justifies severance. *Mason v. United States*, 719 F.2d 1485 (10th Cir.1983). The product of the jury's deliberations demonstrates that they did not have to disbelieve one defense in order to believe the other and, consequently, there was no abuse of discretion with the ruling on severance. *See United States v. Bruno*, 809 F.2d 1097 (5th Cir.1987), *cert. denied* 481 U.S. 1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987).

As his last claim of error, Bennett contends that improper closing argument was made, which appealed to the fears and prejudices of the jury and was preceded by the introduction of irrelevant and inflammatory evidence. We note initially that no objection was made to arguments so the plain error standard again is invoked. *Wheeler v. State*, 691 P.2d 599 (Wyo.1984); *Jones v. State*, 580 P.2d 1150 (Wyo.1978). Furthermore, the claims made by Bennett do not flow from a correct quotation of the record. We find no justification for plain error with respect to closing argument from our pe-

rusal of the record. *See Goggins v. Harwood*, 704 P.2d 1282 (Wyo.1985). With respect to the admission of evidence, we note that to be a matter within the sound discretion of the trial court. *Hatheway v. State*, 623 P.2d 741 (Wyo.1981). The possibility of prejudice from improperly admitted evidence is not sufficient to exclude it, but its probative value must be outweighed by the danger of unfair prejudice. Rule 403, W.R.E. If the evidence has probative value concerning the existence of the charged crimes, the trial court's ruling should stand. *Dorador v. State*, 768 P.2d 1049 (Wyo.1989). Furthermore, there is no indication of prejudicial error if error occurred. Rule 7.04, W.R.A.P.; Rule 49(a), W.R.Cr.P.; *Bishop v. State*, 687 P.2d 242 (Wyo.1984), *cert. denied* 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). Under the circumstances, there exists no prejudicial error relating to either the introduction of the evidence attacked by Bennett or in the arguments of counsel.

It is my conclusion that there is no reversible error to be found in this record. I am particularly at odds with the conclusion that reversible error can be found by applying *Stephens* to these facts. I would affirm Bennett's conviction.