Lisle FORTNER, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 91–256.

Supreme Court of Wyoming.

Dec. 3, 1992.

Leonard D. Munker, State Public Defender, Deborah Cornia, Appellate Counsel, and Erin A. McIntyre, Asst. Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. General; D. Michael Pauling, Asst. Atty. Gen., Theodore E. Lauer, Director of the Prosecution Assistance Program, and Nancy Larned, Student Intern for the Prosecution Assistance Program, for appellee.

Before THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ., and JOFFE, District Judge (Ret.)

JOFFE, District Judge (Retired).

Appellant challenges his conviction for delivery of a controlled substance in violation of Wyo.Stat. § 35-7-1031(a)(ii) (1988). Finding no error in the issues he presents, we affirm.

Appellant raises the following issues for our consideration:

ISSUE I

Did extensive pre-charging delay violate Appellant's constitutional right to due process?

ISSUE II

Was Appellant denied his constitutional right to a speedy trial?

ISSUE III

Was Appellant denied his right to a fair trial by the improper remarks of the prosecutor in closing and rebuttal closing arguments?

ISSUE IV

Did the trial court err in allowing the introduction of evidence concerning prior bad acts of the Appellant?

ISSUE V

Was there sufficient evidence to sustain a conviction of the Appellant for delivery of a controlled substance?

The circumstances leading to Appellant's conviction were started into motion in November 1988 when a confidential informant approached Roxy Jelle, a resident of Gillette and sometime seller of methamphetamine. The informant requested that Jelle obtain some methamphetamine. The informant requested that Jelle obtain some methamphetamine for one Louey Williams. Unknown to Jelle, Williams was a state narcotics agent. On November 17, Williams gave $1,800 of state buy money to Jelle to purchase an ounce of methamphetamine.

Jelle spoke with Katherine Vance about obtaining the methamphetamine. Vance said that she would check around and try to find a source. She spoke with Matthew McGruder, who said he knew someone who might be able to obtain the drug for her. Vance and McGruder went to Mark Myers' residence and talked with him about getting the methamphetamine for them. Myers left his home, went to a liquor store, and made a telephone call to Appellant about obtaining the methamphetamine. Appellant told him to call back in a couple of hours.

Vance and McGruder left Myers' house and returned at about eight or nine o'clock that evening. Myers again called Appellant, and this time Appellant told him to "come on out" to his house. McGruder went by Vance's house and told her that the deal was on. Vance called Jelle and told her that they found someone to sell the methamphetamine to them. Jelle told Vance to stop by and pick up the money, which she did. Jelle kept $200 of the state buy money which was given to her by Williams and gave the remaining $1,600 to Vance to purchase the methamphetamine.

Vance picked up McGruder in her car and took him back to Myers' residence. She gave the money to Myers and McGruder, and they proceeded to Appellant's residence in Myers' pickup. Myers went into the residence and left McGruder in the pickup. Inside, Myers traded Appellant the $1,600 for an ounce of methamphetamine.

Myers and McGruder returned to Myers' residence. There, Myers, McGruder, and Vance all "sampled" the methamphetamine

* Chief Justice at time of oral argument

and weighed it. Vance took the methamphetamine to Jelle, who gave it to Williams.

Jelle, Vance, Myers, and McGruder were each convicted for their roles in the conspiracy which resulted in the delivery of the methamphetamine to Officer Williams. Each of them testified against Appellant at his trial for delivery of a controlled substance in exchange for a favorable consideration by the prosecution in their own cases. Appellant was convicted and received a sentence of not less than one year nor more than five years in the Wyoming State Penitentiary, along with a $1,000 fine and a $50 surcharge for "victims of crimes." He took timely appeal from the court's judgment and sentence.

### Precharging Delay

In his first issue, Appellant contends that his right to due process was violated by the extensive delay between the date his crime was committed, November 17, 1988, and the date the criminal complaint was filed, December 17, 1990. Appellant contends that this twenty-five-month delay was an intentional device used by the prosecutor to gain tactical advantage over him. He further asserts that he was substantially prejudiced by the delay. Our review of the relevant law and the facts of this case convinces us that Appellant has not made a sufficient showing of either prejudice or tactical prosecutorial delay. Accordingly, we hold that his right to due process was not violated by precharging delay.

■ Wyoming is one of only two states which has no statute of limitations for any criminal offense. *Story v. State,* 721 P.2d 1020 (Wyo.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986). When no statute of limitations pertaining to a criminal offense has been adopted, prosecution for such offense may be commenced at any time during the offender's lifetime. *Id.* at 1026. We have recognized, however, that there are limits to the prosecution's ability to bring charges at the end of a long interval after the charged offense has occurred. Excessive precharging delay may violate a defendant's right to due pro-

cess under the United States and Wyoming Constitutions. *Id.* at 1027.

In *Story,* we adopted the rule in *United States v. Marion,* 404 U.S. 307, 323–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971), and *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), that a defendant is denied due process because of precharging delay where

the prosecutor delays filing charges to gain a tactical advantage, perhaps where the prosecutor acts in bad faith in delaying the filing of charges, *and* where substantial prejudice results from the delay.

*Story,* 721 P.2d at 1028 (emphasis in *Story* ).

■ Wyoming has taken a *conjunctive* approach to the *Marion* rule which requires the defendant to establish *both* an improper prosecutorial motivation which caused the delay and substantial prejudice resulting from it. *Cf. State v. Gonzales,* 110 N.M. 218, 794 P.2d 361, 363–67 (Ct. App.1990), *aff'd as modified,* 111 N.M. 363, 805 P.2d 630 (1991) (discussing the "conjunctive" and "balancing" approaches to the *Marion* test.)

■ Appellant asserts that both of these elements are present in his case. We address first the issue of whether Appellant was substantially prejudiced by the delay. Appellant claims that he suffered prejudice because during the precharging delay period he lost a box of business records which would have helped him develop an alibi defense. He also claims to have lost contact with his roommate during this period, who was a potential alibi witness.

Appellant testified at a motion-to-dismiss hearing that he had the business records in February 1989 but lost them sometime after that time—when, exactly, he did not know. His attorney at the time advised him to keep the records after another drug case against him had been dismissed without prejudice. However, he lost them. After this case was filed, he looked everywhere but simply could not find them. Appellant argues that, had the prosecution brought this case earlier, he could have used these records to provide himself with an alibi defense.

■ In the appropriate case, the loss or destruction of essential, exculpatory records after many years might provide a claim of prejudice due to prosecutorial delay. Given enough time, any record may unavoidably be lost to the defendant's prejudice. However, this is not such a case. First of all, the loss of these records was caused not by the delay but by Appellant's own carelessness. He simply misplaced the records even though his attorney told him to keep them. Second, this is not a case where it was unreasonable to expect Appellant to keep the records until the date the information was actually filed. Appellant testified that he was keeping these records for tax purposes. We can take judicial notice that records kept for tax purposes must be kept for several years in case of an audit.

■ Appellant also claims prejudice because he can no longer find his roommate, who, he says, could have helped him support an alibi defense. However, Appellant has not claimed that the roommate would definitely support an alibi defense, only that he *might* if he could be found. This falls somewhat short of being actual prejudice.

Finally, Appellant claims that the delay caused the prosecution's witnesses to lose their memories of the events in question, to his substantial prejudice. It is difficult to see how Appellant was prejudiced by these memory lapses, assuming they were caused by the delay. When it is the *prosecution's* witnesses who have suffered memory losses, the State is prejudiced at least as much as, or more than, the defendant.

"[D]elay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry this burden."

*State v. Mouser*, 806 P.2d 330, 337 (Alaska Ct.App.1991) (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986)).

Furthermore, the memory lapses Appellant cites mostly concern minor contradictions between the witnesses on the events surrounding the transaction, such as the weather on the night in question. The question of whether the State's witnesses remained credible despite these inconsistencies was for the jury to determine, and the jury decided this question against Appellant.

Although it is not strictly necessary to do so since we hold that Appellant has not demonstrated substantial prejudice, we next address the issue of improper motivation for the delay. We do so in order to discuss in detail the burden of proof associated with the issue of improper prosecutorial motive. We have not resolved this issue in our earlier cases on this subject.[1] We are concerned with the proper allocation of proof on the improper motive issue because, although Appellant is in the best position to show how his defense was prejudiced by precharging delay, the *State* generally has nearly exclusive access to the information necessary to prove the *reason* the delay occurred. *See* Phyllis Goldfarb, *When Judges Abandon Analogy: The Problem of Delay in Commencing Criminal Prosecutions*, 31 Wm. & Mary L.Rev. 607, 624–25 (1990).

It seems unjust to leave the burden of proving improper prosecutorial motive entirely with Appellant when the prosecution has nearly exclusive access to information on the reasons it failed to promptly bring charges. The Tenth Circuit Court of Appeals stated:

Upon a *prima facie* showing of fact by a defendant that the delay in charging him has actually prejudiced his ability to defend, and that this delay was intentionally or purposely designed and pursued by the [State] to gain some tactical advantage over or to harass him, the burden of going forward with the evidence shifts to the [State]. Once the [State] presents evidence showing that the delay was not improperly motivated or unjustified, the defendant then bears the ultimate burden of establishing the [State's] due pro-

---

1. We did allude to it in *Phillips v. State*, 835 P.2d 1062 (Wyo.1992).

cess violation by a preponderance of evidence.

*United States v. Comosona,* 614 F.2d 695, 696–97 (10th Cir.1980) (footnote omitted).

While we reject the "balancing approach" advocated in *Comosona* which treats the prosecution's reasons for the delay as a separate factor to be balanced against the defendant's right, we agree with *Comosona's* approach to the burden of proof on the motivation issue. By following this test, the ultimate burden of proof on both *Marion* factors remains with the defendant, but the State's better access to information is accounted for.

■ We now apply the test to the case at hand. Appellant claims that the prosecutor delayed filing charges in order to "strike a deal" with Myers, McGruder, and Vance at the time of their individual trials so that they would testify against him. The initial question is whether this was an unfair delaying tactic designed to achieve a tactical advantage over Appellant. We hold that it was not.

This was a case in which there were several intermediaries between the eventual buyer, Officer Williams, and the seller, Appellant. In order to establish a credible case against Appellant, the prosecution needed cooperation from each link in the chain between the buyer and the seller. Such cooperation is often not received absent the legitimate sanction of potential incarceration.

■ When the State has little chance of convicting a defendant absent the testimony of his coparticipants, a delay necessary to obtain that testimony is not improper. *United States v. Williams,* 684 F.2d 296, 301 (4th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 961 (1983). *See also Harvey v. State,* 774 P.2d 87, 95 (Wyo.1989) (we endorsed the principle from *Barker v. Wingo,* 407 U.S. 514, 534, 92 S.Ct. 2182, 2194, 33 L.Ed.2d 101 (1972), that, in the speedy trial context, some pros-

ecutorial delay in order to obtain a coparticipant's testimony may be permissible).

The delay in this case because of the need to obtain testimony to prove each link in the chain between the buyer and the seller, if indeed that was the reason for the delay, was not an illegitimate tactic on the part of the prosecution. This delay was occasioned by the State's legitimate interest in ensuring that the suspect's guilt could be established beyond a reasonable doubt at trial. *See Lovasco,* 431 U.S. at 790–91, 97 S.Ct. at 2048–49. Since Appellant failed to make a *prima facie* case of improper tactical advantage, it is not necessary to consider the reasons for the delay offered by the State.[2] We hold that Appellant's due process rights were not violated by precharging delay.

## Right to Speedy Trial

■ Appellant complains that he did not receive a speedy trial as guaranteed by the United States and Wyoming Constitutions. The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Article 1, Section 10 of the Wyoming Constitution contains a similar guarantee.

■ In *Cosco v. State,* 503 P.2d 1403, 1405 (Wyo.1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973), we adopted the *ad hoc* balancing test for speedy trial violations contained in *Barker.* The *Barker* test requires us to balance at least four factors: the length of delay, the reason for delay, the defendant's assertion of his right to a speedy trial, and prejudice suffered by the defendant. *Cosco,* 503 P.2d at 1405. The *Barker* test leaves open the possibility that other factors may also be considered. 407 U.S. at 533, 92 S.Ct. at 2193. One such factor we have considered is whether the presumptive 120–day rule between filing of the information or indict-

---

**2.** The State contends that at least a portion of the delay was investigative. It points to an ongoing investigation which culminated in Appellant's arrest in February 1989 on another

drug charge. Charges in the other case were dropped once, when the State's main witness disappeared, and then reinstated on April 9, 1990.

ment and commencement of trial was violated. *See* Rule 204(b) of the Uniform Rules for the District Courts of the State of Wyoming; *Osborne v. State*, 806 P.2d 272, 277 (Wyo.1991); and *Harvey*, 774 P.2d at 93. None of these factors is dispositive; rather, the factors must be carefully weighed and balanced together to arrive at a determination of whether the defendant's right to a speedy trial has been violated. *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193.

We begin our analysis by asking whether Rule 204(b) was violated by the length of delay from the filing of the information to the trial date. *Harvey*, 774 P.2d at 93. The information was filed on June 7, 1991, and the trial began on September 19 of that year. One hundred four days elapsed from information to trial. This is well within the 120–day requirement of Rule 204(b), and there is no violation of the rule. However, it is prudent to also consider the delay from filing of the complaint to trial, as this is the traditional measure for constitutional purposes. 774 P.2d at 94.

■ The length of delay between the filing of the complaint (December 17, 1990) and the trial date (September 19, 1991) in this case was 276 days. In *Caton v. State*, 709 P.2d 1260, 1265 (Wyo.1985), we stated that a 204–day delay was "sufficient to trigger further analysis of the speedy trial factors, but it [was] not so outrageous that it should weigh heavily in the final analysis." In *Binger v. State*, 712 P.2d 349, 352 (Wyo.1986), we held that a ten-and-one-half-month delay was sufficient to trigger inquiry into the other *Barker* factors. Appellant has shown a sufficient delay such that we must consider the remaining factors in our speedy trial analysis.

We next consider the reason for the delay. We begin with the delay which occurred after the information was filed. On May 7, 1991, Appellant waived his right to a speedy preliminary hearing. However, it appears that the preliminary hearing was held on May 30, 1991, as scheduled. On June 21, 1991, *Appellant* filed a motion to extend the time in which to hear motions. The time was extended from June 26, 1991, to July 9, 1991, a delay of thirteen days attributable to Appellant. The court, on its own motion, reset the pretrial conference from August 29, 1991, to September 3, 1991, a delay of five days.

These relevant dates and time periods show that, once the information was filed, the trial process moved along quickly, with only minor delays which were not attributable to the prosecution. The preinformation stage provided most of the delay. The record suggests that this delay was caused by the need to bring Appellant to Campbell County, Wyoming, from Iowa. Appellant was arrested in Iowa on January 19, 1991, on warrants issued both for this case and for Case No. 91–257 (*Fortner v. State*, 835 P.2d 1155 (Wyo.1992)). He was incarcerated in Iowa from that date until May 7, 1991, because he did not immediately waive extradition.[3] He was returned to Wyoming and released on bond on May 7, 1991, one month before the information was filed. It does not appear that the preinformation delay is chargeable to the State; rather, it was due to Appellant's refusal to waive extradition. Appellant has failed to show any significant delay attributable to the State.

We next consider Appellant's assertion of his right to a speedy trial. The record shows that on June 21, 1991, Appellant filed a motion to dismiss on the basis of failure to afford him a speedy trial. At the hearing on this motion, Appellant confined himself to the question of whether there was excessive *precharging* delay. Nevertheless, we do view this as a sufficient assertion of the speedy trial right.

Finally, we consider the prejudice to Appellant caused by the delay. "Prejudice to the defendant may consist of (1) lengthy pretrial incarceration, (2) pretrial anxiety, or (3) impairment of the defense." *Os-*

---

**3.** Appellant was granted credit for the time he served in Case No. 91–257. This credit included 117 days spent in jail in Iowa, up to and including May 7, 1991, when he was released in Wyoming. A careful calculation of the time period of January 19, 1991, through May 7, 1991, shows that only 108 days actually transpired. The State has not contested the amount of credit given; thus, it is not necessary for us to further address this error in calculation.

*borne*, 806 P.2d at 278. Of these three factors, Appellant does not contend that he suffered lengthy pretrial incarceration, as he was released on bail a month before the information was filed.

Appellant argues that he suffered pretrial anxiety because he was unable to obtain employment during the pretrial delay period. Employers would not hire him once he told them he was subject to pending Wyoming charges, and he eventually gave up looking for work. We must remember that Appellant was in jail in Iowa and thus provided for until May 7, 1991. He suffered no meaningful lack of pretrial employment until being released on bond. Since he was not unemployed until he returned to Wyoming and was admitted to bail here, his unemployment lasted for about four and one-half months before trial. While it was certainly detrimental to Appellant, the unemployment period of four and one-half months was not due to an *unreasonable* pretrial delay. Thus, it cannot be considered prejudicial under our speedy trial analysis.

Appellant also argues prejudice to his defense because of his loss of business records and of a potential alibi witness. We have already discussed these claims of prejudice in the context of precharging delay and have found them to be unpersuasive.

Taken as a whole, Appellant has failed to tip the balance of our speedy trial analysis in his favor. Although he has shown a delay which could be prejudicial and did assert his right to speedy trial, he has not shown that the State was responsible for the delay, nor has he demonstrated actual prejudice from the delay. We, therefore, hold that Appellant's rights to a speedy trial under the United States and Wyoming Constitutions were not violated in this case.

Improper Comments by the Prosecutor

 Appellant contends that the prosecutor impermissibly commented upon his failure to testify. We have stated that any comment upon the accused's exercise of his or her right to remain silent calls for reversal of his or her conviction. *Brewster*

*v. State*, 712 P.2d 338, 340 (Wyo.1985); *Westmark v. State*, 693 P.2d 220, 222 (Wyo.1984). Our standard for determining whether a prosecutor has improperly remarked on the accused's failure to take the stand is well-established:

> "[T]he test is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. It is not improper for the government to draw attention to the failure of lack of evidence on point if it is not intended to call attention to the failure of the defendant to testify."

*Oldham v. State*, 534 P.2d 107, 112 (Wyo. 1975) (quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir.1955) (citation omitted)). The question of whether a comment by the prosecutor was either intended as a comment upon the defendant's silence or must naturally and necessarily have been so understood is one of fact for the trial court in the first instance. *Stanton v. State*, 692 P.2d 947, 950 (Wyo.1984).

Appellant complains of the following comments by the prosecution during its closing argument: "Ladies and gentlemen in all of this testimony, in every bit of it, there is nothing contradicting the fact that the ultimate source of that drug was the defendant. Not one word." Also: "But there's not one word of testimony in any of this that contradicts the fact that the ultimate source was the defendant, Lisle Fortner." This argument was made without objection by the defense.

On rebuttal, the State argued: "And I'm going to say to you again there has not be[en] one iota of evidence or testimony that contradicts the fact that the ultimate source of that drug was Lisle Fortner." After the prosecutor made this argument, Appellant moved for a mistrial. The trial court denied this motion. Appellant then asked the trial court to reread the instruction to the jury which it previously gave "that the defendant has the right to not present anything." The trial court found it was unnecessary to do so. The prosecutor continued: "Again, ladies and gentlemen,

nothing, nothing in dispute of the fact or the testimony that the source of the drug was Lisle Fortner."

Appellant argues that these were comments on his failure to testify because Myers testified that only Appellant was at home at the time of the transaction. Thus, the jury would have concluded that only Appellant could have contradicted Myers' testimony that he was the source of the drug.

■ Although the prosecution may not make reference to Appellant's failure to take the stand, it may make comments on the state of the evidence or the failure of the defense to introduce material evidence or to call logical witnesses. *Boyd v. State,* 528 P.2d 287, 292 (Wyo.1974), *cert. denied,* 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975). *See also Oldham,* 534 P.2d at 112–13; and *Deeter v. State,* 500 P.2d 68, 71 (Wyo.1972). A trial court should allow wide latitude of comment on the evidence. *Pearson v. State,* 811 P.2d 704, 708 (Wyo. 1991). A review of the prosecutor's comments here convinces us that the trial court correctly found that there had been no impermissible comment on Appellant's failure to take the stand. Rather, the prosecutor permissibly commented on the lack of evidence adduced by Appellant. Also, the comments on rebuttal, taken in context, were made in response to Appellant's challenges to the State's witnesses' memories. We hold that the trial court did not abuse its discretion in finding no impermissible comment on Appellant's right to remain silent.

■ Appellant also complains of the trial court's failure, once the prosecution's comments were made, to repeat an instruction concerning his right not to put on a case. It was within the trial court's discretion to refuse to give an instruction which had already been given and the substance of which was thus "covered by [an]other instruction[ ]." *Prime v. State,* 767 P.2d 149, 154 (Wyo.1989). We hold that the trial court did not abuse its discretion in this case.

### Evidence of Prior Bad Acts

■ Appellant contends that impermissible evidence of uncharged, prior methamphetamine transactions between himself and Myers was improperly admitted at trial. W.R.E. 404(b) states as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State does not argue that the evidence of Appellant's alleged prior drug deals with Myers was admitted for any purpose permissible under W.R.E. 404(b). Instead, it claims that the testimony was properly admitted because it was only elicited after Appellant "opened the door" by invoking evidence of Myers' past drug activities. Specifically, on cross-examination, Appellant's counsel inquired of Myers as follows:

Q ... Mr. Myers, was this the only methamphetamine transaction you've ever been involved in?

A Do I have to answer that?

THE COURT: Yes.

A (By Mr. Myers) No, it's not.

Q On approximately how many other occasions were you involved in methamphetamine transactions before this date?

A I couldn't really tell you.

Q Okay. Are we talking ten, a hundred, a thousand? Could you give us some estimate?

A Ten.

Q After this date how many methamphetamine transactions were you involved in?

A I don't believe I was involved in any.

On redirect, the prosecution asked:

Q Mr. Myers, prior to November 17th of 1988 had you ever gotten drugs from Lisle Fortner?

The defense objected, to which the trial court responded that Appellant "opened

the door" by his prior cross-examination questions. The prosecution was allowed to reask its question and did so as follows:

Q Mr. Myers, you testified on your cross-examination that you had been involved in previous drug transactions before November 17 of 1988. Were any of those with the defendant?

A Yes, they were.

We have recognized that a defendant may "open the door" to otherwise inadmissible testimony by himself initiating inquiry into a subject:

Succinctly stated, the "opening the door" rule is that a party who in some way permits the trial judge to let down the gates to a field of inquiry that is not competent but relevant cannot complain if his adversary is also allowed to avail himself of the opening within its scope.

*Sanville v. State,* 593 P.2d 1340, 1344 (Wyo.1979).

In *Reinholt v. State,* 601 P.2d 1311 (Wyo.1979), we held that a defendant may "open the door" on cross-examination to evidence of prior criminal misconduct. The defendant's counsel, attempting to show that a police officer had a vendetta against the defendant, cross-examined the officer about why he pursued the defendant. The prosecution asked the officer on redirect to further explain why he suspected the defendant. The officer responded that the defendant and another suspect had been " 'involved in similar situations before together.' " 601 P.2d at 1316. On appeal, this Court stated that, although the officer's testimony implied prior criminal activity by the defendant, it was admissible, in part, because the defendant opened the door by his inquiry on cross-examination.

Cases from other jurisdictions are also helpful on this point. In *Edwards v. State,* 530 So.2d 936 (Fla.Ct.App.1988), *aff'd,* 548 So.2d 656 (Fla.1989), the defendant, who was charged with aggravated battery with a deadly weapon, cross-examined a State's witness about an incident where another man, while shooting at the defendant, missed, and instead shot and killed the witness' friend. The testimony was elicited to bring out the witness' alleged bias

against the defendant. The trial court warned the defense that, if it brought out testimony about this incident, it would open the door to evidence that the defendant pulled a knife on the man in the earlier incident. Once the defendant cross-examined the witness about the incident, the trial court allowed the State on redirect to bring out evidence about the defendant pulling the knife. The Florida Court of Appeals affirmed:

Appellant had sufficient warning from the trial court that she would "open the door" if she brought up the prior incident. Appellant cannot initiate error and then seek reversal based on that error.

530 So.2d at 938.

In *People v. Rivera,* 106 A.D.2d 590, 483 N.Y.S.2d 97 (N.Y.App.Div.1984), an undercover police officer testified against the defendant concerning a drug transaction. On cross-examination, the officer was asked whether he recorded any of his conversations with the defendant. He replied that he had not. On redirect, the prosecution elicited the reason for his failure to make recordings: The officer was afraid because he knew the defendant was also "dealing in guns." 483 N.Y.S.2d at 98. The New York Supreme Court upheld the admissibility of this statement on the grounds that the defendant opened the door by asking the officer about his failure to make the recordings.

We recognize that there are limits to this "open the door" rule, particularly when testimony as prejudicial as that usually excluded by W.R.E. 404(b) is involved. As the Vermont Supreme Court recognized: "[W]e must not create a license for the prosecutor to engage in 'overkill' nominally justified by the defendant's actions in raising a line of questions." *State v. Recor,* 150 Vt. 40, 549 A.2d 1382, 1386 (1988). However, the line between permissible inquiry and prosecutorial overkill was not crossed in this case. After Appellant attempted to discredit the State's witness with evidence of his other drug transactions, the State could respond with evidence of Appellant's involvement in some of those same transactions. This is a con-

sequence of the reciprocal nature of the "open the door" rule. We, therefore, hold that the testimony about Appellant's prior drug transactions was properly admitted once Appellant opened the door by his cross-examination of the State's witness.

### Sufficiency of the Evidence

In his final issue, Appellant argues that there was insufficient evidence to convict him of the crime charged. When reviewing a sufficiency-of-the-evidence claim, we examine all the evidence in the light most favorable to the State, giving the State every reasonable inference to be drawn therefrom, to determine whether any reasonable trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *Walter v. State*, 811 P.2d 716, 719 (Wyo.1991).

Appellant attacks Myers' testimony because he contradicted other witnesses on what the weather was like on the night he purchased the methamphetamine from Appellant, because he could not remember the date he drove to Appellant's trailer for the sale, and because he may have been confused about the time that evening that he left for Appellant's trailer. Since Myers' testimony was the only direct evidence linking Appellant to the sale, Appellant argues that there was insufficient evidence for his conviction. However, the inconsistencies and memory gaps in Myers' testimony were relevant to his credibility, which was for the jury to determine rather than for this Court. *Kavanaugh v. State*, 769 P.2d 908, 911 (Wyo.1989).

As we said in *Simmons v. State*, 687 P.2d 255, 258 (Wyo.1984) (citations omitted), another drug case concerning sufficiency of the evidence:

> In actuality, appellant's argument goes more to the credibility of the witnesses than to the sufficiency of the evidence.... We have consistently held that the question of credibility of witnesses rests with the trier of fact, and this determination will not be disturbed on appeal. There is no rule of law that we are aware of that says that a fact

finder must believe or disbelieve anyone. In fact, the trier of fact is free to accept all, part or none of the evidence offered by a witness.

### Conclusion

Having found no reversible error, we affirm Appellant's conviction.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

I joined in this court's decision to affirm this appellant's conviction in the companion case of *Fortner v. State*, 835 P.2d 1155 (Wyo.1992). However, I cannot accept the additional infirmities in the present appeal, both constitutional and procedural, which constitute denial of appellant's right to a fair trial. I dissent.

My greatest concern results from the discernible shifting of a real burden of proof from the state to the defendant as a justification to affirm. I fear that this case further illustrates an adjudicatory direction for trial and appeal that "anything goes" when necessary to obtain a conviction or to justify affirming upon appeal. *Haworth v. State*, 840 P.2d 912 (Wyo.1992), Urbigkit, J., dissenting.

Further need exists to address the three general issues presented by this appeal: (1) obvious unexplained and prejudicial delay in charging appellant with a criminal offense and conduct of the trial thereafter; (2) comments of the prosecutor related directly to both *burden of proof* to be placed on the defendant and *failure of the defendant to testify;* and (3) bad acts evidence again becoming a significant contributor to the prosecutorial evidence used to obtain the conviction.

Within these conjunctive events, a weak case, at best, is sustained for conviction by circumstances not related to proof of guilt. Historically, we are well served by the reminder that Anglo–American courts long ago determined that conviction of a crime should be based solely upon evidence of guilt. *Wehr v. State*, 841 P.2d 104 (Wyo. 1992), Urbigkit, J., dissenting. After a general analysis of the issues presented, I

am not encouraged by my understanding of the judiciary's concept of fairness and justice under the analytical framework used here for decision.

First, this court places the burden *on the defendant* to show improper tactical advantage in favor of the prosecutor, without requiring justification of the delayed charging and trial pursuit. Even "balancing" is rejected leaving an impossible subjective burden for the disadvantaged accused to attempt to pursue any rights of due process. All of this is done conjunctively to address due process only if both *bad faith of the prosecutor* and *substantial prejudice* to the defendant *can be proven by the accused.*

In recitation of *United States v. Comosona,* 614 F.2d 695 (10th Cir.1980), this majority decision does not even follow the generally stated rule:

> Those cases that employ burden-shifting after a defendant's prima facie showing of prejudice generally employ balancing as well, weighing the prejudice to the accused against the reasons for the delay. The Fifth [*United States v. Brand,* 556 F.2d 1312, 1317 n. 7 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978)], Seventh [*United States v. Solomon,* 688 F.2d 1171, 1179 (7th Cir.1982)], Eighth [*United States v. Savage,* 863 F.2d 595, 598 (8th Cir.1988), *cert. denied,* 490 U.S. 1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989); *United States v. Taylor,* 603 F.2d 732, 735 (8th Cir.), *cert. denied,* 444 U.S. 982, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979)], Ninth [*United States v. Moran,* 759 F.2d 777, 781 (9th Cir.1985), *cert. denied* 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986); *United States v. Mays,* 549 F.2d 674 [670], 677 (9th Cir. 1977)] and Tenth Circuits [*Comosona,* 614 F.2d at 696] all rendered decisions endorsing a balancing approach to the due process question once the defendant establishes both delay-related prejudice and impermissible reasons for delay.

Phyllis Goldfarb, *When Judges Abandon Analogy: The Problem Of Delay In Commencing Criminal Prosecutions,* 31 Wm. & Mary L.Rev. 607, 625 (1990) (footnotes omitted).

The unexplained delay of this case was dismissed by a conjectural analysis in the fact finding surmised by this court about what might have been. The question of prejudice fares no better within this result-oriented analysis. This court's opinion cites a comprehensively written law journal article, Goldfarb, *supra,* 31 Wm. & Mary L.Rev. 607. After having cited that legal resource, this majority totally neglects to understand that article's analysis of the constitutional issues involved here.

In introduction, Phyllis Goldfarb first recognized, by remembering great writings of times past:

> "Time is like a river made up of the events which happen, and a violent stream [it is]; for as soon as a thing has been seen, it is carried away and another comes in its place and this will be carried away as well."

> "It is monstrous to put a man on his trial after such a lapse of time. How can he account for his conduct so far back? If you accuse a man of a crime the next day, he may be enabled to bring forward his servants and family to say where he was and what he was about at the time; but if the charge be not preferred for a year or more, how can he clear himself? No man's life would be safe if such a prosecution were permitted. It would be very unjust to put him on his trial."

*Id.* at 607 (quoting G. Long, *Meditations of Marcus Aurelius* 140 (Book IV, § 43) (1930) and *The Queen of Robbins,* 1 Cox Crim.Cas. 114 (Somerset Winter Assizes 1844)).

The author, after comprehensive and cogent analysis, concludes:

> The problems posed by the languid pace of American criminal justice argue for the development of procedures to expedite the processing of criminal cases. Tinkering with the case law of pre-accusation delay is less likely to promote this goal than other institutional modifications. Nevertheless, because the Constitution does provide some protection to defendants from the hazards of charging

delay, constitutional criminal law should be responsive to the harms that such delay can create. This Article has sought to demonstrate that the current body of law is poorly suited to that task.

Moreover, the law of charging delay defies mainstream understandings of analogical reasoning processes. Had legal reasoning operated as advertised, we would likely analyze charging delay as a speedy trial problem, or less preferably but still appropriately, as a compulsory process problem or a true due process problem, because each is analogous to charging delay in legally significant ways. Any of these doctrinal choices represents a sounder analysis of the underlying issues than the analysis the Supreme Court specially fashioned.

The abandonment of analogical reasoning in this situation is likely explained by psychological pressures derived from the decisionmakers' awareness of the need for crime control, although crime control needs are not well-served by sacrificing individual protections in these circumstances. Moreover, institutional integrity is undermined by inconsistency in the application of the internal logical rules of the legal system. Given the facility with which courts sidestepped such rules in the instant context, we should explore a less categorical and more straightforward approach to addressing the harms of pre-accusation delay. I have suggested one approach, a harm-based approach involving reasoning by analogy to societal norms, in the hope that it can stimulate thinking about improved methods of legal analysis. Until expansive approaches to analogical reasoning become more fashionable, analytic inconsistencies that threaten the legitimacy of the legal process should be highlighted and their damage repaired. In the meantime, some number of accused persons will continue to lose their liberties, potentially even their lives, when, after the ravages of time's passing, they are convicted at trials that cannot be trusted.

*Id.* at 679–80 (footnote omitted).

The right to speedy justice is not a casual idea recently developed to bedevil those involved in dilatory prosecutorial activities. The right to speedy justice has been part of the Anglo–American criminal tradition since the Magna Charta. *United States v. Lovasco,* 431 U.S. 783, 800, 97 S.Ct. 2044, 2054, 52 L.Ed.2d 752 (1977), Stevens, J., dissenting. Justice Stevens had earlier recognized this legal tradition:

[T]he right to a speedy trial "is one of the most basic rights preserved by our Constitution." That holding rested in part on common-law tradition of such a fundamental nature as to be reflected in the Magna Carta itself.[5]

---

[5] As the Court noted, [*Klopfer v. North Carolina*] 386 U.S. [213], at 224 [97 S.Ct. 988, 994, 18 L.Ed.2d 1 (1967)], the Magna Carta as interpreted by Sir Edward Coke guaranteed to all speedy justice.

"In [Coke's] explication of Chapter 29 of the Magna Carta, he wrote that the words 'We will sell to no man, we will not deny or defer to any man either justice or right' had the following effect:

" 'And therefore, every subject of this realme, for injury done to him *in bonis, terris, vel persona,* by any other subject, be he ecclesiasticall, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay.' " Quoting E. Coke, 2 Institutes 55 (Brooke, 5th ed. 1797).

*Moody v. Daggett,* 429 U.S. 78, 92, 97 S.Ct. 274, 281, 50 L.Ed.2d 236 (1976), Stevens, J., dissenting (quoting *Klopfer v. North Carolina,* 386 U.S. 213, 224, 87 S.Ct. 988, 994, 18 L.Ed.2d 1 (1967)).

To insure speedy justice in Wyoming under the clear and specific terminology of the Wyoming Constitution, I submit that this majority applies the wrong rule for the wrong reason with the wrong result. *Cf. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044. In this case, the delays from the date of the occurrence, November 17, 1988, to the date the complaint was filed, December 17, 1990, to the date that the information was

filed, June 7, 1991, to the date of trial, September 19, 1991, are factually unjustified within this record by actual evidence and cannot, by any criteria, be accorded acceptance as speedy justice. From the Magna Charta of English law to Wyo. Const. art. 1, § 6, due process, and Wyo. Const. art. 1, § 10, speedy trial, this detail of delay offends justice. Justice is not, in my perspective, a concept of "tipping the balance" on some imaginary scale; it is an enduring search to justify the integrity of any justice delivery system in a civilized society. *See Wehr*, 841 P.2d 104, Urbigkit, J., dissenting; and *Doggett v. United States*, — U.S. ——, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

I am additionally offended with the prosecutorial closing argument which highlights the fact that appellant chose not to testify and further to suggest that a burden of proof of non-guilt can be thrust upon the accused. "Guilty unless proven innocent" is not an unknown tactic of some prosecutors. There really is a proper way to communicate with the jury in argument without sidestepping the constitutionally protected rights of the accused, including switching the burden of proof and highlighting, for effect, the exercise of the privilege not to testify. Argument by presentation of the full story is different than a discourse about what somebody else failed to do in defense which attacks a constitutional right. *Summers v. State*, 725 P.2d 1033 (Wyo.1986); *Westmark v. State*, 693 P.2d 220 (Wyo.1984); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

Finally, bad acts evidence as a substitute for proof of guilt, *Wehr*, 841 P.2d 104, Urbigkit, J., dissenting, does not change colors when characterized as following an evidentiary presentation of the accused which "opened the door." In this case, it was not appellant's cross-examination that communicated bad acts evidence to the jury. In essence, what this majority determines is that use of cross-examination as a constitutionally guaranteed due process right demeans and extinguishes rights further anchored in ancient legal history that guilt should be proven by actual probative evidence of occurrence and not reputation or irrelevant insinuation. W.R.E. 404(b); *Bishop v. State*, 687 P.2d 242 (Wyo.1984), *cert. denied*, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985).

Appellant may have been guilty of the offense charged—delivery of a controlled substance. Whether or not that is true, he was not fairly convicted under the circumstances indelibly highlighted by this trial record.

Consequently, I dissent.